### JOHN L. DENNING & CO., Inc., et al. v. FLEMING and four other cases.

#### Nos. 3325–3329.

Circuit Court of Appeals, Tenth Circuit.

March 7, 1947.

Rehearing Denied April 14, 1947.

698

George Siefkin, of Wichita, Kan. (Robert C. Foulston, Samuel E. Bartlett, George B. Powers, Carl T. Smith, John F. Eberhardt, Stuart R. Carter and T. E. Woods, all of Wichita, Kan., on the brief), for appellants John L. Denning and others.

Walter D. Murphy, Atty., OPA, of Washington, D. C. (William E. Remy, Deputy Adm., for Enforcement, David London, Director, Litigation Division, and Albert M. Dreyer, Chief, Appellate Branch, all of Washington, D. C., and James B. Nash, District Enforcement Atty., and Lawrence J. Wetzel, Enforcement Atty., OPA, both of Wichita, Kan., on the brief), for Phillip B. Fleming, Adm.

Before PHILLIPS, BRATTON and HUXMAN, Circuit Judges.

HUXMAN, Circuit Judge.

The Administrator, Office of Price Administration,[1] filed three separate actions in the United States District Court for the District of Kansas charging violations of the maximum price ceiling regulations relating to the sale and purchase of broomcorn. Case No. 2397 below was filed against John L. Denning and Company, Inc.[2] The complaint charged that the corporation had sold three carloads of broomcorn for which

---

[1] Herein called the Administrator.

[2] Herein called the corporation.

it demanded and received prices or considerations in excess of the maximum authorized by Regulation No. 468. It also alleged that the corporation had demanded and received advance cash deposits from customers for orders for broomcorn and that such advances constituted an overcharge to such customers.

Case No. 2400 below was filed against Effie N. Denning, John L. Denning, Jr., and Edwana Collins, copartners doing business as Denning Broomcorn Company.[3] The complaint in this case charged the sale of eight carloads of broomcorn for a consideration in excess of the maximum ceiling price fixed by the regulation. It was also charged in this case, as in No. 2397, that the defendants had demanded and received advance cash deposits against orders for broomcorn and that this constituted a violation of the regulation.

Case No. 2398 below was filed against the corporation and partnership. The complaint in this case alleged that the corporation and the partnership had violated the regulation with respect to twenty-four carloads of broomcorn. The complaint alleged that these twenty-four cars of broomcorn had been sold jointly to purchasers for a consideration in excess of the maximum price fixed by the regulation. It was alleged that the sales were divided between the corporation and the partnership for the express purpose of evading the regulation and for collecting a higher price than authorized for the broomcorn.

In addition to a judgment for treble damages, the Administrator also asked for injunctive relief. Other claims were advanced in the complaints which it will not be necessary to note, because they are not pressed in these appeals. The three cases were consolidated and tried to the court. The findings of fact by the trial court are not challenged. The exceptions of the respective appellants are to the court's conclusions of law and its judgments based thereon.

The trial court found and determined: (1) That the receipt of advance cash deposits did not violate the regulation. (2)

That the split shipments by which the corporation and the partnership both sold broomcorn to the same customers in less than 14,000 pound lots, and shipped them in the same car at the same time, did not violate the regulation. (3) That the practice of the corporation and the partnership of shipping split sales in full carload lots from their warehouse in Wichita and each charging L.C.L. freight rates[4] while only paying full carload rates from Wichita, constituted a violation of the regulation. Based thereon, monetary judgments were entered for the actual amount of the overcharge, plus $1. An injunction was entered in Case No. 2398, but was denied in No. 2397, because an injunction had been entered in No. 2398. The respective parties have appealed from the parts of the judgments adverse to their contentions.

The questions presented by the separate appeals are these: (1) Did the trial court err in holding that the defendants could charge L.C.L. freight rates only from the point of origin to the warehouse in Wichita, but were not permitted to charge such rates from there on when the broomcorn was shipped in carload lots? (2) Was the trial court in error in concluding that the receipt of advance cash deposits for orders for broomcorn did not violate the regulation? (3) Could the corporation limit sales to its customers to less than 14,000 pounds and thus in many cases require a number of orders to meet their requirements, in order to charge a higher price, without violating the regulation? (4) Did the practice of splitting orders for broomcorn from a customer between the corporation and the partnership, so that each sale was for less than 14,000 pounds but the aggregate of both was in excess of 14,000 pounds, in order to obtain a higher price, constitute a violation of the regulation?

Subsection 3 of Price Regulation 468 establishes the maximum price for broomcorn sold by producers. Subsection 9 establishes maximum prices for broomcorn sold by persons other than producers. This regulation as far as pertinent, is set out in footnote No. 5.

---

[3] Herein called the partnership.
[4] Less than carload freight rates.

[5] "§ 9 Maximum prices for sales by persons other than producers of broom

The defendant corporation had a warehouse in Wichita, Kansas, where the broomcorn purchased by both it and the copartnership, in L.C.L. lots, was stored. Sales were made on a delivered basis from this warehouse. In a large number of instances, a quantity of broomcorn invoiced in the name of the corporation and a quantity invoiced in the name of the partnership, making a carload, would be shipped in a single car to the point of destination. In all such instances freight was paid at carload rates from Wichita, while the delivered price to the customer included the maximum ceiling price plus freight from the point of origin to Wichita and from there to the point of ultimate destination computed at L.C.L. rates. [6] In this way, each defendant would receive more freight from the customer than was actually paid by it to the transportation company.

Whether this constituted a violation of the regulation presents no serious difficulty when the purpose of permitting the addition of freight to the maximum price which could be charged for broomcorn is considered. The pertinent part of the regulation fixed the maximum price which the owner could charge for broomcorn. It was intended that he should have the full benefit of this price. When he sold the broom-corn f.o.b., he could charge no more than the maximum price because no additional charge was incurred, but where the sale was on a delivered basis he was compelled to pay the additional freight. Unless he could add this item to the price, he would not get the benefit of the maximum lawful price. It was for this reason that the regulation provided that the amount of freight actually paid could be added to the maximum price f.o.b. A number of super-refined, hypothetical cases are posed to show that inequity might result from such a construction. Thus the phrase in Sec. 9 (a), "The term 'Point of origin' means in case shipment to the purchaser is made by rail, the point at which the broomcorn is loaded on the railroad car * * *" is singled out and it is argued that under this phrase Wichita might be considered the point of origin and no freight could be added from the place where the broomcorn was purchased to Wichita. One cannot

corn. Maximum prices for all sales and deliveries of broom corn by persons other than the producers of the broom corn are established by this section.

"(a) Sales for shipment direct from point of origin. The maximum prices applicable to sales of broom corn shipped direct from point of origin to the purchaser shall be:

"Type of broom corn: Price per ton
"Shed cured broom corn  $322.50
"All other broom corn  272.50

"The above prices are net cash, f.o.b. point of origin, loaded on railroad car, truck or other conveyance. The term 'point of origin' means, in case shipment to the purchaser is made by rail, the point at which the broom corn is loaded on the railroad car, * * *.

"Sales on a delivered basis. If broom corn is sold on a delivered basis for shipment direct from point of origin, a delivered price in excess of the applicable maximum price, f.o.b. point of origin specified above may be charged, consisting of such maximum price plus the amount actually paid to the carrier, if shipment is made by a common carrier, * * *.

"§ 9(b) Other sales. The maximum prices applicable to all sales of broom corn other than the sales provided for in section 3 and in paragraph (a) of this section 9 shall be:

| "Quantity shipped or delivered at one time | Shed cured broom corn (Price per ton) | All other broom corn (Price per ton) |
|---|---|---|
| "14,000 lbs. and over | $337.50 | $287.50 |
| 3,000 lbs. to 13,999 lbs. | 347.50 | 297.50 |
| Under 3,000 lbs. | 360.00 | 310.00 |

"The above maximum prices are net cash f.o.b. point of delivery of the broom corn to a carrier for shipment to the purchaser, loaded on railroad car, truck or other conveyance. Freight from the producing district to this point of delivery to a carrier may be added to these prices in accordance with the following: [Here follows an itemized list of points from which these extra charges may be made.]

"Sales on a delivered basis. If broom corn is sold on a delivered basis, a delivered price in excess of the applicable maximum price f.o.b. point of delivery to a carrier set forth above may be charged, consisting of such maximum price plus the amount actually paid to the carrier, if delivery is made by common or contract carrier, * * *."

[6] L.C.L. shipments carried a higher freight rate than full carload shipments.

determine the true meaning of a phrase, sentence, or even a paragraph, by lifting it out of its natural setting. Its true meaning can be ascertained only by considering the whole subject matter of which it is a part. It is sufficient to say that no such claim as is posed by this hypothetical case is advanced by anyone. Considered in its entirety, it is perfectly obvious that the intent of the regulation was to permit the recovery of freight actually paid, and no more.

■ The defendant appellants, however, contend that this question was not an issue in the case; that it was not raised by the pleadings; that it was first injected into the case by the court itself at the conclusion of the trial, and that it was reversible error for the court to render judgment on a matter not within the issues as framed by the pleadings. It is not necessary to determine the soundness of the defendant appellants' position on this issue, because even if correct they could not prevail. At the conclusion of the evidence, the court discussed this question with the attorneys for the respective parties. The court expressed the view that the inclusion in the price of broomcorn of more freight than was actually paid constituted a violation of the regulation. The causes were recessed to enable the parties to compute the excess freight charged. At a later hearing evidence was introduced as to the amount of such overcharge. No objection was made by the defendants at any time. By joining the plaintiffs in computing the amount of such freight overcharges and failing to object, they consented to a trial upon this issue and may not now for the first time on appeal be heard to object thereto.[7]

■ There was a shortage of broomcorn during the times in question. The defendants solicited orders for broomcorn and required a cash deposit with each order. These deposits amounted to a considerable sum and were in possession of the defendants for a number of months before the orders were filled and the broomcorn was

delivered. The Administrator contends that the possession of this money amounted to the receipt of an additional consideration, and that interest thereon should be charged against the defendants. The trial court found that these deposits were taken as a guarantee that the customer would receive broomcorn and were not otherwise used by the defendants. This finding is not challenged. Under these circumstances it is difficult to see how the mere possession of this fund constituted any additional consideration. This case is clearly distinguishable upon the facts from the cases relied upon by the Administrator to sustain this point. In all of them there was an additional benefit or consideration which was sufficient to cause the court to conclude that an additional consideration was received. We are of the opinion that the mere possession of these funds in escrow, as it were, without any use being made of them by the defendants, was insufficient to establish an additional consideration which would constitute a violation of the regulation.

■■ The Administrator contends that the corporation's practice of limiting its sale of broomcorn to a single customer to less than 14,000 pounds when he desired to purchase a greater quantity, and thus compelling him to place additional orders, each of less than 14,000 pounds, until his requirements were filled, constituted evasion. It is argued that this practice was an obvious pretext and that these separate orders in fact were but a single order with shipments split up in order to obtain a higher price. While the defendants do not concede that these separate shipments to a single customer by either the corporation or the partnership alone constituted split shipments, they will be so treated for the purpose of this assignment. It is too well settled to need any discussion or citation of authorities that there is a difference between avoiding and evading the effects of a law or regulation. The regulation in question fixed a maximum price for sales of broomcorn in quantities greater than 14,000 pounds and a higher

[7] Venuto v. Robinson, 3 Cir., 118 F.2d 679; Continental Ill. Natl. Bk. & Trust Co. v. Ehrhart, 6 Cir., 127 F.2d 341; Pearl Assur. Co., Ltd. v. First Liberty Natl. Bk., 5 Cir., 140 F.2d 200; Scott v. B. & O. R. Co., 3 Cir., 151 F.2d 61; Rule 15(b), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

price for sales of less than 14,000 pounds. In the absence of a provision in the regulation prohibiting split sales of less than 14,000 pounds to a customer whose requirements were greater, we know of no principle of law which would prohibit a vendor from selling only less than 14,000 pounds to a customer, even though that compelled the customer to place additional orders, and when the only motive for such limitation was to obtain the higher price. While it may be true, as argued by the Administrator, that the higher price for sales of less than 14,000 pounds was intended to aid the small producer, the regulation as promulgated is not so limited or drawn. Under these circumstances we fail to see any evasion by an owner limiting sales to less than 14,000 pounds.

█ A much more serious question is presented as to the so-called split shipments, in which a customer bought half of his broomcorn from the corporation and the other half from the partnership, and all of which was shipped in the same car. In such instances the amount purchased from each vendor was less than 14,000 pounds but the aggregate was in excess thereof. By this practice, each vendor charged the higher price for shipments of less than 14,000 pounds. The trial court upheld the validity of these transactions on the theory that the corporation and the partnership were separate legal entities and thus could each sell a half car to the same customer and ship it in the same car.

The corporation had been in business many years. John L. Denning was the dominant force in the corporation. He owned approximately 70 to 80 per cent of its stock, and he and his family owned approximately 85 per cent of its stock. It is also clear that he was the moving force in the formation of the partnership, consisting of his wife, his son and his daughter. He arranged credit for the partnership at the bank. The partnership was formed October 1, 1943. Regulation 486 became effective October 19, 1943. While the partnership was formed shortly before the regulation went into effect, it is clear that Denning knew that it was in the making. He was a member of the advisory committee for adopting regula-

tions regulating the sale of broomcorn. He testified that he was present in Kansas City in July, 1943, when this regulation was discussed. The record makes it clear that the partnership was formed with the coming regulation in mind.

While he testified that his wife was the managing partner, he wrote letters for the partnership which he signed as manager of the partnership. He was authorized to and did draw drafts on the partnership account. Employees of the corporation were also employees of the partnership. Both organizations had the same listed telephone number. They used the same postoffice box. They had the same customers. Denning offered broomcorn to his customers on condition that broomcorn would be purchased from both the corporation and the partnership. This broomcorn was then shipped in the same car and invoiced approximately one-half in the name of each, so that each invoice would be for less than 14,000 pounds. Denning testified himself that "Looking at this thing from an outside man's viewpoint it might look as though we used these two companies as a device to defeat the price regulations." He testified that there were other ways in which the same thing could be accomplished but that they probably would not look so good. In other words, he adopted the device which looked best to him—a family partnership which he controlled, dominated and operated as part of the corporation.

Under these facts the conclusion is inescapable that the partnership was but the alter ego of the corporation and the separateness of the two should be disregarded and these split shipments should be treated as single shipments of more than 14,000 pounds. Such arrangements as this have been universally disapproved for the purpose of circumventing the effect of legislative enactments. The trial court should have treated these shipments as single shipments and rendered judgment for the Administrator accordingly. This question arises in Case No. 2398 below, which in this court, on appeal, is No. 3327. The judgment in No. 3327, Philip B. Fleming v. John L. Denning and Company, Inc., et al., is accordingly reversed, and the cause

is remanded with directions to proceed in conformity with the views expressed herein. In all other respects, the judgments appealed from are severally affirmed.